# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 5, 2006          Decided July 7, 2006

No. 04-7013

CHARLES SINGLETARY,
APPELLANT

v.

EDWARD F. REILLY, JR., IN HIS OFFICIAL CAPACITY AS
COMMISSIONER OF THE U.S. PAROLE COMMISSION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01263)

*Catharine F. Easterly*, Assistant Public Defender, Public Defender Service of the District of Columbia, argued the cause for appellant. With her on the brief was *Timothy P. O'Toole*, Assistant Public Defender.

*Elizabeth H. Danello*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III* and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: SENTELLE and BROWN, *Circuit Judges,* and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Charles Singletary's parole was revoked in 1996 based on his alleged participation in a murder. The evidence tying Singletary to this offense—for which he has been imprisoned for the last ten years—consisted solely of hearsay testimony relayed by a prosecutor and an investigating detective. The reliability of the hearsay, most of it multilayered, was never established, and its accuracy remains open to serious questions. A parole revocation hearing is not a criminal trial, and the same standards of proof and admissibility of evidence do not apply. Yet though the government is not required to carry a heavy burden in such proceedings, it cannot return a parolee to prison based on a record as shoddy as this one. We therefore conclude that Singletary is entitled to a new parole revocation hearing.

I

Singletary was originally sentenced to nine to twenty-seven years' imprisonment (minus 388 days) for robbery, armed robbery, and assault with a deadly weapon. He began serving his sentence on January 28, 1983, and was granted parole on June 1, 1990. In June 1995, Singletary was arrested for the murder of Leroy Houtman, a.k.a. Vaughn Stokes, but the case was never brought before a grand jury, and Singletary was eventually released without being charged. However, on July 30, 1996, the District of Columbia Board of Parole held a joint hearing to consider parole revocation for Singletary and his alleged accomplice, Gary Barnes, based on the Houtman murder.[1]

---

[1] For Barnes, this hearing served as a continuation of a previous hearing held several months earlier.

We cannot be sure of everything that transpired at the hearing. Singletary has provided us with a partial transcript created by his counsel from an audiotape of the proceedings. However, the transcript cuts off in the middle of a sentence, and Singletary claims that he has never been provided with a recording or transcript of the rest of the hearing. Our only other information regarding the events of that day comes from the Board's semi-legible handwritten findings of fact and Singletary's abbreviated description of the hearing, neither of which provides any significant additional details.

Singletary was charged with failing to obey all laws and using a deadly weapon in connection with first degree murder. He denied both accusations. The Board began by asking Peter Zeidenberg, an Assistant United States Attorney, if he "could tell [the Board] what [he] kn[e]w about this case." Zeidenberg presented his view of what "the evidence was in this case" through his own narrative as well as by questioning Detective Todd Amis, who investigated Houtman's murder. Most of the information described by Zeidenberg and Amis originally came from two individuals—Verdez Smith and Terri Washington—who were not identified by name during the hearing, though their names have been revealed during this litigation. Smith and Washington claimed to have learned about the murder from Carmelita Metts, who was convicted of conspiracy to murder Houtman.

According to Zeidenberg and Amis, Houtman's body was discovered in Metts's apartment complex when plumbers working in a utility room smelled an odor and saw a foot sticking out from some plastic. Houtman had been stabbed fifty-one times; his body had been wrapped in insulation that was pulled down from the ceiling. He had been dead for approximately three weeks.

Amis stated that the body was finally identified three months later by Houtman's sisters, based on a piece of jewelry Houtman was wearing. Amis then began a search for Houtman's missing truck, which bore fruit when he discovered it in Smith's possession. Smith initially claimed that someone named "Tony" gave him the truck; he later admitted to receiving it from Metts, although he claimed not to know where she obtained it. After being charged with Houtman's murder, Smith changed his story again, claiming that Metts—his former girlfriend—had asked him to help her kill Houtman, but that he had refused. Smith claimed that Metts had later given him Houtman's truck so that he could sell it, as he had previous experience as a car thief. The charges against Smith were dropped.

The police also interviewed Washington, who initially denied knowing anything about the murder (as Amis stated in a sworn statement made after the hearing). Amis told the Board that Washington then claimed Metts confessed to helping Barnes and Singletary murder Houtman.[2] Allegedly, Metts lured Houtman to her apartment, where Barnes and Singletary (and possibly Metts herself) stabbed him, stored the body in the closet temporarily, and later moved it to the basement. Amis informed the Board that Smith also claimed Metts told him of this sequence of events.[3]

---

[2] At Metts's trial, Washington testified that she was dating Houtman prior to his disappearance; she subsequently met and started dating Barnes. Thus, in a rather bizarre love triangle, Washington either dated her ex-boyfriend's murderer or—as Singletary implies—helped murder her boyfriend and then framed her new boyfriend for the crime.

[3] Additionally, Zeidenberg stated—apparently recapping Smith's testimony at trial—that Smith went to Metts's apartment after the murder and noticed that Metts "looked like she hadn't slept." Smith allegedly told his ex-girlfriend that she "look[ed] terrible," to which

Zeidenberg stated that the police searched Metts's apartment and found some of Houtman's blood. He stated that when Metts found the notice left on her door by the police, she was with Washington, who then accompanied her to the barber shop where Singletary worked. Zeidenberg and Amis both stated that Washington claimed to have seen Singletary wearing a distinctive ring that had belonged to Houtman.(However, at Metts's trial, Washington actually testified that Singletary was wearing Houtman's bracelet, and that she saw *Barnes* wearing Houtman's ring at one point. Neither piece of jewelry was ever recovered by the police.) According to Zeidenberg, Metts told Washington and Smith she gave Houtman's keys to Barnes and Singletary in order for them to search his apartment for drugs and money, but that they did not give her a share of whatever they found.

Singletary was eventually arrested. After his arrest, Amis asked if he knew Metts or Barnes, but Singletary allegedly denied knowing either. Amis later found a picture of Singletary and Barnes together at a wedding. Singletary's attorney had an opportunity to cross-examine Amis (although only part of this exchange is reflected in the hearing transcript). When asked if the police had "anything, anything at all besides double hearsay that connects [Singletary and Barnes] to the murder," Amis simply stated, "no." Amis also admitted that no murder weapon had been found.

Zeidenberg acknowledged Singletary's case had never been presented to a grand jury because the prosecution's only

---

she replied, "Well, you'd look bad too if you hadn't slept for two days." Metts allegedly said she had "had a dead body in [her] closet for the last two days," but showed Smith that it wasn't there anymore. She then allegedly showed Smith the padlocked door to the utility room in the basement where the body had been concealed.

admissible evidence would have been Metts's statements. The prosecution did not want to "cut a deal" with Metts to get her to testify; "any confession that she gave would be so suspect that . . . it would [be] counterproductive." According to Singletary's former attorney, prior to the hearing, the Board did not inform him of any evidence, witness statements, or other information regarding the alleged parole violations. He claimed that Singletary brought two "favorable witnesses" to the hearing, but the Board did not permit them to enter the hearing room. The record does not reflect that Singletary complained about either issue during the hearing.

The Board revoked Singletary's parole on August 6, 1996. Singletary filed for a writ of habeas corpus in 1997, but the writ was denied by the D.C. Superior Court, and the D.C. Court of Appeals affirmed. *Singletary v. Quick*, No. 97-SP-1984 (D.C. July 24, 1998) (unpublished order). He again sought habeas relief in 2000, but again the Superior Court denied his claims, and again the Court of Appeals affirmed. *Singletary v. D.C. Bd. of Parole*, 794 A.2d 56 (D.C. 2001) (unpublished table decision). Finally, Singletary petitioned for a writ of habeas corpus in the U.S. District Court for the District of Columbia, and his petition was denied one more time. *Singletary v. D.C. Bd. of Parole*, No. 00-cv-01263 (D.D.C. Dec. 16, 2003) (unpublished opinion). The district court found that "the only challenge raised by petitioner through his counsel at the parole revocation hearing that is now being raised was the challenge to the sufficiency of the evidence." *Id.* at 7. The court thus considered other challenges brought by Singletary forfeited, a decision that Singletary does not challenge on appeal. Finding the hearsay sufficiently reliable, the district court denied Singletary's petition. *Id.* at 8-10.[4]

---

[4] On appeal, we granted the Board's motion to substitute the United States as its successor in interest, given that the Board no

7

II

In *Morrissey v. Brewer*, 408 U.S. 471, 487-88 (1972), the Supreme Court mandated a hearing "prior to the final decision on revocation by the parole authority," if the parolee desires such a hearing. The hearing

> must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.

*Id.* at 488. While declining to "write a code of procedure" for such hearings, the Court did specify that "the minimum requirements of due process" included:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

---

longer exists and the United States consented to our exercise of jurisdiction. *Singletary v. D.C. Board of Parole*, No. 04-7013 (D.C. Cir. Apr. 24, 2006) (unpublished order).

*Id.* at 488-89. The hearing process "should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.* at 489. *See also Gagnon v. Scarpelli*, 411 U.S. 778, 782 n.5 (1973) ("[W]e did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence.").

Parole revocation violates due process if the decision is "either totally lacking in evidentiary support or . . . so irrational as to be fundamentally unfair." *Duckett v. Quick*, 282 F.3d 844, 847 (D.C. Cir. 2002). In *Crawford v. Jackson*, 323 F.3d 123, 128 (D.C. Cir. 2003), we found that "[r]eliance on hearsay in parole revocation hearings is not per se impermissible." However, "the use of unsubstantiated or unreliable hearsay would certainly eviscerate the safeguards guaranteed by *Morrissey* and *Gagnon*." *Id.* (internal quotation marks and ellipses omitted). Rather than focusing on whether evidence would be admissible at a criminal trial, courts reviewing revocation decisions "are properly more concerned with whether the evidence considered as a whole, including the hearsay evidence, was both sufficient in quantity and reliability to ensure fundamental due process rights." *Id.* We applied the *Duckett* standard for the sufficiency of the evidence and "follow[ed] other circuits that have examined the reliability of the particular hearsay evidence, condemning reliance on it when the court reaches a negative evaluation." *Id.* at 129.

Other circuits have split on the question of whether, prior to admitting hearsay, the parole authority must make an explicit finding of good cause for not allowing a parolee to confront an adverse witness. *See, e.g., Barnes v. Johnson*, 184 F.3d 451, 454 (5th Cir. 1999) ("[T]he hearing officer must make an explicit, specific finding of good cause and state the reasons for that finding."); *Egerstaffer v. Israel*, 726 F.2d 1231, 1234 (7th Cir.

1984) (stating that no explicit finding is required when hearsay evidence "bears substantial guarantees of trustworthiness"). While we have not required an explicit finding of good cause at the hearing, we have placed the burden on the "parole authorities to ensure, before relying on hearsay, that there are sufficient indicia of reliability under the circumstances at hand to protect the prisoner's due process rights." *Crawford*, 323 F.3d at 129. We expressed "concern about the reliance in parole revocation hearings on hearsay in police reports" and warned about the consequences of relying on unreliable hearsay:

> [G]iven judicial concern in light of the protections guaranteed by *Morrissey*, a parole authority takes a certain risk that its decision to revoke parole will not be judicially sustained where it relies solely on hearsay contained in a police investigative report as the basis for its decision. . . . [T]hat risk is measurably lessened only in circumstances that demonstrate the strong reliability of the hearsay evidence.

*Id. See also Ash v. Reilly*, 431 F.3d 826, 829-30 (D.C. Cir. 2005) (explaining that our *Crawford v. Jackson* decision still governs parole revocation hearings even after *Crawford v. Washington*, 541 U.S. 36 (2004), which held that use of "testimonial" hearsay at a criminal trial violates a defendant's Sixth Amendment rights unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him).

In our *Crawford* case, the Board relied on a police investigative report in revoking a prisoner's parole. We found that the report was "quite detailed, an indicia of reliability," as it provided "a fairly full account of the circumstances surrounding" the parole violation. *Crawford*, 323 F.3d at 130. We also found several other factors to be relevant: the report was corroborated on some points by the parolee's admissions at the

hearing and contained "internal corroboration" of the alleged violation. *Id.* Next, the parolee was given a chance to present contrary evidence at the hearing, but he chose not to do so, even though he was not denied access to the report and knew the identities of the relevant witnesses. *Id.* Under those circumstances, "given the indicia of reliability of the police investigative report, the Board's reliance on the hearsay evidence did not render its revocation decision so lacking in support that it was fundamentally unfair." *Id.* at 131.

## III

While the hearsay evidence at issue in *Crawford* "was both sufficient in quantity and reliability to ensure fundamental due process rights," *id.* at 128, a far different case is presented here. We have no cause to question the quantity of the evidence presented at the hearing; if its reliability had been established, the Board's revocation decision would most likely not be problematic. Yet the issue we confront today is not the quantity of the hearsay presented, but rather its reliability. We find that the hearsay presented at the hearing was not demonstrated to be reliable and that the Board's decision to revoke Singletary's parole was therefore "totally lacking in evidentiary support." *Id.* at 129 (citation omitted).

Almost all the evidence presented at the hearing was hearsay, much of it multilayered. Zeidenberg and Amis described, in their own words, what Washington and Smith had previously stated about Houtman's murder during the police investigation and Metts's trial. The most important evidence—Metts's alleged confessions to Smith and Washington—involves a second layer of hearsay, as Zeidenberg and Amis were only telling the Board what Smith and Washington claimed Metts told them.

The government emphasizes that Smith and Washington made statements under oath at Metts's trial, under penalty of perjury and subject to cross-examination. While this argument does suggest some degree of reliability, it is an incomplete rationale. Smith and Washington were only subject to cross-examination by Metts's attorney; while Metts may have had the motivation to question their general credibility, Singletary's identity as a co-conspirator was not a central issue. In fact, Singletary was not mentioned in the brief cross-examination of either witness at the trial. The record also reflects that Smith and Washington both changed their stories after initially denying any knowledge about the murder. Given these somewhat suspicious circumstances, there is room to doubt that they accurately identified Singletary, rather than some other individual, as assisting Metts.[5] Yet Zeidenberg and Amis did not reveal Smith's and Washington's identities at the hearing.[6] "Thus the [B]oard had no way of knowing how reliable the informants were and had no real basis on which to resolve the credibility issue against the parolee . . . ." *Birzon v. King*, 469 F.2d 1241, 1244 (2d Cir. 1972) (finding error when a parole board relied on anonymous statements in a report rather than receiving testimony directly).

In *Crawford*, we found that a high level of detail in a hearsay statement can indicate reliability. 323 F.3d at 130. Metts allegedly did describe some details of the murder to Smith and Washington (such as what was done with the corpse), but other

---

[5] Indeed, Singletary implies (albeit without overwhelming support) that Washington and Smith may have been attempting to shift blame for the murder away from themselves.

[6] The record before this court does not indicate that the Board was informed of Smith's and Washington's identities while Singletary was not present.

details are notably absent from the record (such as the date of the murder). More significantly, many details regarding Singletary's involvement were never explained, including why he would participate in the murder and whether he even knew Houtman. At the same time, some of the details that Smith and Washington did provide were not accurately reflected at the hearing. For example, Washington testified that she saw Singletary wearing Houtman's bracelet and Barnes wearing Houtman's ring, yet Zeidenberg and Amis both told the Board that Washington saw Singletary wearing the "distinctive" ring.

The government contends Singletary's failure to present contrary evidence at his hearing supports a finding that the hearsay was reliable. Yet Singletary's attorney has stated in an affidavit that Singletary did bring two witnesses, but they were not allowed to enter the hearing room. He also stated that, until the hearing, the government gave him no information about the charges or the evidence to be presented. The government has not contradicted these assertions, which, if true, would have made it rather difficult for Singletary to present any rebuttal evidence. The government argues Singletary failed at the hearing to object to the alleged exclusion of his witnesses and therefore forfeited this issue. Even if he did forfeit his ability to argue that the exclusion of his witnesses violated his due process rights, however, we surely will not draw the *opposite* conclusion—that he deliberately chose not to present evidence—especially given that the burden is on the government to "ensure . . . that there are sufficient indicia of reliability" before relying on hearsay. *Id.* at 129.

Hence, the government has not established that the hearsay deemed adequate by the Board was "sufficient in . . . reliability to ensure fundamental due process rights." *Id.* at 128. Smith and Washington, who apparently changed their stories at least once each, provided the key information relied on by the Board in

revoking Singletary's parole. Yet the two hearsay declarants were never cross-examined on the issue of Singletary's involvement—let alone cross-examined at the hearing—nor were their identities even revealed for purposes of evaluating their credibility. The record before us contains notable inconsistencies and omissions, and a less than complete account of the hearing itself.

We emphasize that we are not deciding whether the evidence would have been sufficient to merit parole revocation if its reliability had been established or if it had been presented in a more trustworthy format. On this record, though, we are unable to conclude that the Board properly relied on the hearsay in question. Absent this hearsay evidence, the Board's decision was "totally lacking in evidentiary support." *Id.* at 129 (quoting *Duckett*, 282 F.3d at 847). We therefore reverse the judgment of the district court and remand with instructions that Singletary be provided with a new parole revocation hearing consistent with this opinion.

*So ordered.*