# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 4, 2008　　　　　　　Decided June 20, 2008

No. 06-1397

HUZAIFA PARHAT,
PETITIONER

v.

ROBERT M. GATES, SECRETARY OF DEFENSE, ET AL.,
RESPONDENTS

———

On Petition for Review of an Order
of a Combatant Status Review Tribunal

———

*P. Sabin Willett* argued the cause for petitioner. With him on the briefs were *Susan Baker Manning*, *Rheba Rutkowski*, *Neil McGaraghan*, and *Jason S. Pinney*.

*Gregory G. Katsas*, Deputy Associate Attorney General, U.S. Department of Justice, argued the cause for respondents. On the brief were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Douglas N. Letter*, *Robert M. Loeb*, *August E. Flentje*, *Pamela M. Stahl*, *Jennifer A. Paisner*, and *Catherine Y. Hancock*, Attorneys.

Before: SENTELLE, Chief Judge, and GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   A Combatant Status Review Tribunal has decided that petitioner Huzaifa Parhat, a detainee at the United States Naval Base at Guantanamo Bay, Cuba, is an "enemy combatant."  This is the first case in which this court has considered the merits of a petition to review such a decision under the Detainee Treatment Act of 2005.  The Act grants this court jurisdiction to "determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant."   We conclude that the Tribunal's decision in Parhat's case was not valid.

Parhat is an ethnic Uighur, who fled his home in the People's Republic of China in opposition to the policies of the Chinese government.  It is undisputed that he is not a member of al Qaida or the Taliban, and that he has never participated in any hostile action against the United States or its allies.   The Tribunal's determination that Parhat is an enemy combatant is based on its finding that he is "affiliated" with a Uighur independence group, and the further finding that the group was "associated" with al Qaida and the Taliban.  The Tribunal's findings regarding the Uighur group rest, in key respects, on statements in classified State and Defense Department documents that provide no information regarding the sources of the reporting upon which the statements are based, and otherwise lack sufficient indicia of the statements' reliability. Parhat contends, with support of his own, that the Chinese government is the source of several of the key statements.

Parhat's principal argument on this appeal is that the record before his Combatant Status Review Tribunal is insufficient to support the conclusion that he is an enemy combatant, even under the Defense Department's own definition of that term. We agree.  To survive review under the Detainee Treatment Act,

a Tribunal's determination of a detainee's status must be based on evidence that both the Tribunal and the court can assess for reliability. Because the evidence the government submitted to Parhat's Tribunal did not permit the Tribunal to make the necessary assessment, and because the record on review does not permit this court to do so, we cannot find that the government's designation of Parhat as an enemy combatant is supported by a "preponderance of the evidence" and "was consistent with the standards and procedures" established by the Secretary of Defense, as required by the Act.

To affirm the Tribunal's determination under such circumstances would be to place a judicial imprimatur on an act of essentially unreviewable executive discretion. That is not what Congress directed us to do when it authorized judicial review of enemy combatant determinations under the Act. Accordingly, we direct the government to release Parhat, to transfer him, or to expeditiously convene a new Combatant Status Review Tribunal to consider evidence submitted in a manner consistent with this opinion. As discussed in Part V, this disposition is without prejudice to Parhat's right to seek release immediately through a writ of habeas corpus in the district court, pursuant to the Supreme Court's recent decision in *Boumediene v. Bush*, No. 06-1195, slip op. at 65-66 (U.S. June 12, 2008).

We also deny, without prejudice, the government's motion to protect from public disclosure all nonclassified record information that it has labeled "law enforcement sensitive," as well as the names and "identifying information" of all U.S. government personnel mentioned in the record. Although we do not doubt that there is information in these categories that warrants protection, the government has proffered only a generic explanation of the need for protection, providing no rationale specific to the information actually at issue in this case.

By resting its motion on generic claims, equally applicable to all of the more than one hundred other detainee cases now pending in this court, the government effectively "proposes unilaterally to determine whether information is 'protected.'" *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007). Without an explanation geared to the information at issue in this case, we are left with no way to determine whether that specific information warrants protection -- other than to accept the government's own designation.  But as we held in *Bismullah*, "[i]t is the court, not the Government, that has discretion to seal a judicial record, which the public ordinarily has the right to inspect and copy." *Id.* (internal citations omitted). We therefore deny the government's motion and direct it to file a renewed motion, accompanied by a copy of the record identifying the specific information it seeks to designate and pleadings explaining why protecting that specific information is required.

I

Parhat is a Chinese citizen of Uighur heritage.  Combatant Status Review Tribunal (CSRT) Decision Report, encl. 2, at 1 (Dec. 6, 2004) (App. 14) (CSRT Decision).  The Uighurs are from the far-western Chinese province of Xinjiang, which the Uighurs call East Turkistan.  *Id.*  According to Parhat, he fled China in May 2001 because of "oppression and torture imposed on [Ui]gh[u]r people by the Chinese Government."  CSRT Exhibit R7, at 1 (App. 51) (FBI interview report dated May 11, 2002). "This oppression," he said, "included harassment, forced abortions for more than two children, high taxes, the taking away of land, and the banishing of educated people to remote areas."  *Id.*  Parhat arrived at a Uighur camp in Afghanistan in June 2001.  CSRT Decision, encl. 2, at 1 (App. 14).

On September 11, 2001, members of al Qaida attacked the World Trade Center and the Pentagon with hijacked commercial

airplanes, killing almost three thousand people. Seven days later, Congress authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization To Use Military Force (AUMF), Pub. L. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note). Pursuant to the AUMF, the President ordered the United States Armed Forces to invade Afghanistan, where the Taliban (which then governed the country) had been supporting and harboring al Qaida.

In mid-October 2001, U.S. aerial strikes destroyed the camp where Parhat had been living. Thereafter, according to his undisputed testimony, Parhat and seventeen other unarmed Uighurs fled the camp, eventually crossing into Pakistan. Local villagers took the Uighurs in, gave them food and shelter, and then -- in approximately December 2001 -- handed them over to Pakistani officials who turned them over to the U.S. military. In June 2002, the United States transferred Parhat to the U.S. Naval Base at Guantanamo Bay, Cuba, where he remains imprisoned.

In 2003, a military officer of the Criminal Investigation Task Force (CITF), U.S. Department of Defense (DOD), who was charged with reviewing Parhat's case, "'recommend[ed] the release of Parhat under a conditional release agreement.'" Pet'r Br. 6 (quoting CSRT Decision, encl. 2, at 2 (App. 15)).[1]

---

[1]The following paragraph is redacted from the publicly released copy of this opinion because it contains classified information. That is the explanation for all of the other redactions as well. Counsel for both Parhat and the government have full access to the unredacted opinion.

On July 7, 2004, in a memorandum to the Secretary of the Navy, the Deputy Secretary of Defense issued an order establishing Combatant Status Review Tribunals (CSRTs). Order Establishing Combatant Status Review Tribunal (July 7, 2004) (DOD Order). Three weeks later, the Secretary of the Navy, whom the DOD Order had designated "to operate and oversee th[e] [CSRT] process," issued a memorandum that established the standards and procedures for those Tribunals. Implementation of Combatant Status Review Tribunal Procedures at 2 (July 29, 2004) (Navy Memorandum). The Navy Memorandum describes the Tribunals as "non-adversarial proceeding[s] to determine whether each detainee" at Guantanamo "meets the criteria to be designated as an enemy combatant." *Id.* at E-1 § B. The Order and Memorandum both define an "enemy combatant" as:

> an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Id.*; DOD Order at 1.

A CSRT was held for Parhat on December 6, 2004. The proceedings consisted of an unclassified session, at which Parhat was present and answered questions under oath, followed by a classified session, at which Parhat was not present and in which the Tribunal considered classified documents not made available to him. The only evidence regarding the circumstances of Parhat's background and capture was his own interviews and

---

[Classified material redacted.]

testimony. Parhat denied association with al Qaida or the Taliban, stated that he had gone to Afghanistan solely to join the resistance against China, and said that he regarded China alone -- and not the United States -- as his enemy. *See* CSRT Decision, encl. 3, at 3-4, 6-7 (App. 21-22, 24-25). The Tribunal did not find to the contrary. *See id.* encl. 2, at 1-4 (App. 14-17).

Nonetheless, the Tribunal determined that Parhat was an enemy combatant. It did so on the theory that he was "affiliated" with a Uighur independence group known as the East Turkistan Islamic Movement (ETIM), that ETIM was "associated" with al Qaida and the Taliban, and that ETIM is engaged in hostilities against the United States and its coalition partners. *See id.* encl. 1, at 1 (App. 11). The basis for the charge of Parhat's "affiliation" with ETIM was that the Uighur camp at which he lived and received training on a rifle and pistol was run by an ETIM leader. *See id.* encl. 2, at 1 (App. 14); *id.* encl. 3, at 6 (App. 24). The Tribunal acknowledged, however, that "no source document evidence was introduced to indicate . . . that the Detainee had actually joined ETIM, or that he himself had personally committed any hostile acts against the United States or its coalition partners." *Id.* encl. 2, at 3 (App. 16). The grounds for the charges that ETIM was "associated" with al Qaida and the Taliban, and that it is engaged in hostilities against the United States or its coalition partners, were statements in classified documents that do not state (or, in most instances, even describe) the sources or rationales for those statements. Parhat denied knowing anything about an al Qaida or Taliban association with Uighur camps. *See id.* encl. 3, at 4, 6-7 (App. 22, 24-25).

Notwithstanding its determination that Parhat was an enemy combatant, the Tribunal stated that "this Detainee does present an attractive candidate for release." *Id.* encl. 2, at 2 (App. 15). It "urge[d] favorable consideration for release . . . and also

urge[d] that he not be forcibly returned to the People's Republic of China" because he "will almost certainly be treated harshly if he is returned to Chinese custody." *Id.* at 4 (App. 17). The Defense Department did not release him.

In July 2005, Parhat filed a petition for a writ of habeas corpus in the United States District Court for the District of Columbia. The district court concluded that its jurisdiction was unclear and stayed Parhat's case pending this circuit's resolution of appeals by other Guantanamo detainees, including the case of *Boumediene v. Bush. See Kiyemba v. Bush*, No. 05-1509, Mem. Order at 1-2 (D.D.C. Sept. 13, 2005).

In December 2005, while *Boumediene* was pending, Congress passed the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, 119 Stat. 2680 (2005) (reprinted at 10 U.S.C. § 801 note). The DTA granted this court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." DTA § 1005(e)(2)(A). But it also provided that no court "shall have jurisdiction to . . . consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." *Id.* § 1005(e)(1) (amending 28 U.S.C. § 2241). In *Hamdan v. Rumsfeld*, the Supreme Court held, inter alia, that the DTA's bar against habeas claims did not apply to claims already pending on the date of its enactment. 126 S. Ct. 2749, 2769 (2006). Congress responded in October 2006 with the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006) (codified in part at 28 U.S.C. § 2241 & note), which restated the habeas bar, providing that no court shall have jurisdiction to consider the habeas application of an alien "detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such

determination." MCA § 7(a) (again amending 28 U.S.C. § 2241). The MCA further declared that the habeas bar applies "to all cases, without exception, pending on or after the date of the enactment of [the MCA] which relate to any aspect of the detention . . . of an alien detained by the United States since September 11, 2001." *Id.* § 7(b).

In December 2006, Parhat filed a petition in this court for relief under the DTA, and, in the alternative, for a writ of habeas corpus. While Parhat's petitions were pending, another panel of the court decided *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). In that decision, the panel held that the MCA bars judicial consideration of detainees' pending habeas petitions and that the bar is not an unconstitutional suspension of the writ. *Id.* at 994. Judge Rogers dissented, concluding that the detainees have a constitutional right to habeas and that the DTA is an inadequate substitute. *See id.* at 995 (Rogers, J., dissenting). The Supreme Court granted certiorari, 127 S. Ct. 3078 (2007), and heard argument on December 5, 2007. On June 12, 2008, the Court reversed the panel, holding that the detainees "have the constitutional privilege of habeas corpus," that the DTA's procedures for review of their status "are not an adequate and effective substitute for habeas corpus," and that the MCA "operates as an unconstitutional suspension of the writ." *Boumediene v. Bush*, No. 06-1195, slip op. at 1-2 (U.S. June 12, 2008).

Meanwhile, the DTA petitions of numerous Guantanamo detainees proceeded in this circuit. In *Bismullah v. Gates*, decided on July 20, 2007, the court addressed a number of procedural issues common to a group of eight DTA petitioners, including Parhat. *See* 501 F.3d 178 (D.C. Cir. 2007). The central issue was whether the record on review in this court is limited -- as the government argued -- to the evidence actually presented to the CSRT, or whether it includes all of the

"Government Information." *Id*. at 180. The latter, as defined in the Navy Memorandum, consists of all "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." Navy Memorandum at E-1 § E(3); *see* 501 F.3d at 180.

*Bismullah* held that the record on review in this court is all of the Government Information. 501 F.3d at 180. On September 7, 2007, the government sought rehearing and rehearing en banc. The panel denied rehearing on October 3, 2007, *see* 503 F.3d 137, and the full court denied rehearing en banc on February 1, 2008, *see* 514 F.3d 1291. The government then filed a petition for certiorari in the Supreme Court and sought a stay from the *Bismullah* panel pending the Supreme Court's determination. The panel granted the motion in part and stayed, pending disposition by the Supreme Court, the government's obligation in the eight cases to produce additional record material beyond that presented to the CSRTs. *See Bismullah v. Gates*, No. 06-1197, Order at 3-4 (D.C. Cir. Feb. 13, 2008). The government's petition for certiorari is currently pending.

On October 29, 2007, while its request for en banc review in *Bismullah* was still under consideration, the government produced to Parhat's counsel the record (both classified and unclassified) of what was actually presented to Parhat's CSRT. On November 1, Parhat filed a motion asking this court to review the CSRT's determination based solely upon that record. While reserving his right to future review based on all of the Government Information, to which he is entitled under *Bismullah*, Parhat contended that the materials before the CSRT are sufficient to establish as a matter of law that he is not an enemy combatant. Further delay while the government sought certiorari regarding his entitlement to a broader record, he

argued, would be unnecessary and unjust.  The government did not oppose Parhat's request.

On December 14, 2007, we set the case for briefing, and on April 4, 2008 we heard argument, solely on the record before the CSRT.  *See Parhat v. Gates*, No. 06-1397, Order at 2 (D.C. Cir. Dec. 14, 2007).  That is the case that is presently before us.  Also before us is the government's motion to designate as "protected information" certain unclassified information in the CSRT record that it has produced to counsel and the court.

II

The DTA grants this court jurisdiction to "determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant."  DTA § 1005(e)(2)(A).  The scope of our review is "limited to the consideration of":

> (i) whether the status determination of the [CSRT] was consistent with the standards and procedures specified by the Secretary of Defense for [CSRTs] (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and

> (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

*Id.* § 1005(e)(2)(C); *see Boumediene*, slip op. at 47-49 (noting the limited nature of the DTA's jurisdictional grant to this

court). The DOD "standards and procedures" referenced in DTA § 1005(e)(2)(C)(i) and (ii) are set out in the DOD Order and Navy Memorandum discussed in Part I above. The *Bismullah* opinion describes those standards and procedures in detail. *See* 501 F.3d at 181-82; *see also Boumediene*, slip op. at 37 (describing the limited nature of "the procedural protections afforded to the detainees in the CSRT hearings"). Here, we describe only those that are relevant to our disposition.

Each CSRT is composed of "three neutral commissioned officers." Navy Memorandum at E-1 § C(1). The Recorder, also a commissioned officer, is charged with gathering the "Government Information," which is defined as "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee" meets the enemy combatant criteria. *Id.* at E-1 § E(3); *see id.* at E-2 § C(1). The Recorder must present to the Tribunal both the "Government Evidence," defined as "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant," and any evidence in the Government Information that is exculpatory, described as "evidence to suggest that the detainee should not be designated as an enemy combatant." *Id.* at E-1 § H(4).

The Recorder must also make the Government Information available to the detainee's assigned Personal Representative, a military officer who is "neither a lawyer [n]or an advocate," but who must explain the CSRT process to the detainee and may assist the detainee in preparing for it. *Id.* at E-1 § F(5); *id.* at E-2 § C(4); *id.* at E-3 §§ A, D. The Personal Representative may view the classified evidence but may not share it with the detainee. *See id.* at E-1 § F(8); *id.* at E-3 § C(4). The detainee's discussions with the Personal Representative are neither privileged nor confidential. *Id.* at E-3 §§ C(1), D. The detainee may testify or introduce relevant documentary evidence at the

hearing, and may present the testimony of any witness who is "reasonably available and whose testimony is considered by the Tribunal to be relevant." *Id.* at E-1 § F(6); *see Boumediene*, slip op. at 38 (noting, in connection with this provision, that the detainee's "ability to rebut the Government's evidence against him is limited by the circumstances of his confinement and his lack of counsel at this stage").

The CSRT must "determine whether the preponderance of the evidence supports the conclusion that [the] detainee meets the criteria to be designated as an enemy combatant." Navy Memorandum at E-1 § G(11). There is a rebuttable presumption that the Government Evidence is "genuine and accurate." *Id.* The Tribunal "may consider hearsay evidence, taking into account the reliability of such evidence in the circumstances." *Id.* at E-1 § G(7).

An important DOD "standard" for our purposes is the definition of "enemy combatant." As noted above, the DOD Order and the Navy Memorandum both define an "enemy combatant" as:

> an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

DOD Order at 1; Navy Memorandum at E-1 § B.

Parhat contends that the record before his CSRT does not support its finding that he is an enemy combatant, even under the government's own definition, and hence that the Tribunal's determination is not "consistent with the standards and

procedures specified by the Secretary of Defense for Combatant Status Review Tribunals." DTA § 1005(e)(2)(C)(i). In the alternative, he argues that the government's definition is "inconsistent with the Constitution and laws of the United States," *id.* § 1005(e)(2)(C)(ii), because it exceeds the authorization that Congress gave the President in the AUMF. Although he makes a number of arguments in this regard, Parhat's principal contention is that, by defining "enemy combatant" as including an individual who was merely "part of or supporting" forces "associated" with the Taliban or al Qaida, the government exceeded the AUMF's authorization to use force "against those nations, organizations, or persons" that the President determines "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001," or that "harbored such organizations or persons." AUMF § 2(a).

The government responds that the evidence before Parhat's CSRT does support his designation as an enemy combatant under the DOD definition. It further maintains, based on a theory of organizational equivalence, that this definition is consistent with the AUMF. In the AUMF, the government argues, Congress authorized force not only against the Taliban and al Qaida, but also against any person or entity that is effectively part of the same organization. *See* Unclassified Oral Arg. Tr. 23-24. Moreover, even if the DOD definition is not authorized by the AUMF, the government maintains that it is nonetheless within the President's constitutional authority as Commander in Chief.

While disputing the government's statutory and constitutional arguments, Parhat emphasizes that we need not reach them if we determine that the evidence that was before his CSRT is insufficient to support his status as an enemy combatant under the government's own definition. Nor does the government argue that Parhat's status as an enemy combatant

can be maintained if the evidence does not support the government's own regulatory definition. To the contrary, the government recognizes that the DTA authorizes us to determine "whether the [CSRT's determination] was consistent with the standards and procedures specified by the Secretary of Defense." DTA § 1005(e)(2)(C)(i). Accordingly, because we conclude below that the evidence that was before the CSRT is insufficient to categorize Parhat as an enemy combatant under DOD's definition, we do not reach the other issues disputed by the parties.

## III

In this Part, we describe the evidence relevant to the CSRT's determination that Parhat is an enemy combatant and identify deficiencies in that evidence. In Part IV, we explain why the record evidence is insufficient to support the Tribunal's determination under the DTA.

At his CSRT, Parhat repeatedly stated that his only enemy, and the only enemy of his fellow Uighurs, is the government of China. He testified that the Uighurs

> have never been against the United States and we do not want to be against the United States. . . . The reason we went into Pakistan was because in China there is torture and too much pressure on the Uighur people. . . . The Uighur people only have the privilege of having two children. If a female gets pregnant with a third child, the government will forcibly take the kid through abortion.

CSRT Decision, encl. 3, at 3 (App. 21).[2]  Neither the CSRT nor this court, of course, has any authority to determine whether Parhat truly is an enemy of China.  As the CSRT recognized, "[t]he People's Republic of China is not a coalition partner for enemy combatant classification purposes."  *Id.* encl. 2, at 3 (App. 16).

Parhat also denied any association with al Qaida or the Taliban, *see id.* encl. 3, at 4-7 (App. 22-25), and the CSRT did not find him to be "an individual who was part of or supporting Taliban or al Qaida forces," Navy Memorandum at E-1 § B.  Nor did it find that he "committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."  *Id.* To the contrary, it expressly found that he did *not* engage in hostilities against the United States or the Northern Alliance (an Afghani coalition partner of the United States), CSRT Decision, encl. 2, at 2 (App. 15), and declared that there was "no source document evidence . . . that the Detainee . . . himself had personally committed any hostile acts against the United States or its coalition partners," *id.* at 3 (App. 16).

The Tribunal nonetheless determined that Parhat was an enemy combatant.  It did so on the basis of the following finding:  that Parhat "is affiliated with forces associated with al Qaida and the Taliban (i.e., 'the East Turkistan Islamic Movement,') that are engaged in hostilities against the United States and its coalition partners."  *Id.* encl. 1, at 1 (App. 11).

The parties agree that, for a detainee who is not a member of al Qaida or the Taliban, DOD's definition establishes three elements that the government must prove by a preponderance of the evidence to designate an individual as an enemy combatant:

---

[2] [Classified material redacted.]

(1) the petitioner was part of or supporting "forces"; (2) those forces were associated with al Qaida or the Taliban; and (3) those forces are engaged in hostilities against the United States or its coalition partners. In Parhat's case, this means that the government must show that: (1) Parhat was part of or supporting ETIM; (2) ETIM was associated with al Qaida or the Taliban; and (3) ETIM is engaged in hostilities against the United States or its coalition partners. *Accord* Pet'r Br. 21-22; Resp't Br. 10-11, 18-19; Pet'r Reply Br. 14-15; Unclassified Oral Arg. Tr. 21.

A

The first element of the DOD definition of enemy combatant requires proof that Parhat was "part of or supporting" ETIM. Neither Parhat nor any other detainee stated that Parhat was a *member* of ETIM. And as the CSRT noted, "no source document evidence was introduced to indicate . . . that the Detainee had actually joined ETIM." CSRT Decision, encl. 2, at 3 (App. 16).

To support the contention that Parhat was "part of or supporting" ETIM, the government relies on evidence that comes almost entirely from Parhat's own statements and those of other Uighur detainees. Parhat stated that, when he decided to leave China, he headed for a Uighur camp, widely known in Xinjiang province, that was located in the Tora Bora mountains of Afghanistan. *See* CSRT Exhibit R7, at 1-2 (App. 51-52) (FBI interview report dated May 11, 2002). At the camp, he received training on a Kalashnikov rifle and a pistol, which "consisted of weapon disassembly and cleaning," Pet'r Br. 18 n.22 (quoting CSRT Exhibit R3, at 2 (App. 37))[3]; performed guard duty, *see*

---

[3][Classified material redacted.]

CSRT Exhibit R7, at 2 (App. 52); and helped to build a house, *see* CSRT Decision, encl. 3, at 6 (App. 24). He sought the training, he said, only to fight the Chinese government. *Id.* encl. 1, at 2 (App. 12); *id.* encl. 3, at 3-4 (App. 21-22).

Parhat testified that a man named Hassan Maksum, whom the government has identified as a leader of ETIM, was a leader at the camp. *See id.* encl. 3, at 6 (App. 24). Parhat maintains that the fact that Maksum was a leader of the camp is not enough to make it an "ETIM camp," and that the kind of activities in which Parhat participated at the camp are not enough to establish that he was "part of or supporting" ETIM. The government argues to the contrary. We need not decide those questions. As we discuss below, the evidence on the second and third elements of DOD's definition of enemy combatant, unlike the evidence on the first, does not disclose from whence it came. It is therefore insufficient to support the Tribunal's determination because it does not permit the Tribunal or this court to assess its reliability.

B

The second element of DOD's definition requires proof that ETIM was "associated" with al Qaida or the Taliban. The Navy Memorandum does not define "associated." Parhat contends that the term is inconsistent with the AUMF, which authorizes the President to use force only against "those nations, organizations, or persons he determines planned, authorized, committed, or aided *the terrorist attacks that occurred on September 11, 2001*, or harbored such organizations or persons." AUMF § 2(a) (emphasis added). And he stresses that there is no allegation that ETIM itself had anything to do with the September 11 attacks or that it harbored any organization that did.

The government maintains that an entity that, subsequent to September 11, becomes so closely associated with al Qaida or the Taliban that it is effectively "part of the same organization," Unclassified Oral Arg Tr. 23, is covered by the AUMF because it thereby becomes the same "organization[]" that perpetrated the September 11 attacks, AUMF § 2(a). This argument suggests that, even under the government's own definition, the evidence must establish a connection between ETIM and al Qaida or the Taliban that is considerably closer than the relationship suggested by the usual meaning of the word "associated."[4] We need not decide the precise meaning of the term,[5] however, as there is a more fundamental problem with the evidence employed by the government to prove this element. That problem is discussed below and in Part IV.

The principal evidence supporting this element comes from four U.S. government intelligence documents, one from the Department of State and three from components of the Department of Defense. The following paragraphs describe the four documents. Because the documents are almost entirely

---

[4]*See* Unclassified Oral Arg. Tr. 24 ("Judge Sentelle: So you are dependent on the proposition that ETIM is properly defined as being part of al Qaida, not that it aided or abetted, or aided or harbored al Qaida, but that it's part of [?] Mr. Katsas: Correct. . . . in order to fit them in the AUMF.").

[5]We have recognized in a related context that two organizations with different names may nonetheless be the same organization, simply operating under aliases. *See National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 199-200 (D.C. Cir. 2001) (affirming the authority of the Secretary of State to designate the NCRI as a foreign terrorist organization where the Secretary found "that the PMOI is a foreign organization engaging in terrorist activities . . . and that the NCRI and the PMOI are one and the same").

classified, our description is redacted from the public version of this opinion.

[Classified material redacted.]

Finally, the government relies on the interview report of a single Uighur detainee, Akhdar Basit, which states that Basit told the interviewer that a leader at the camp told him that the camp "had been provided to the Uigh[u]rs by the Taliban in order that the Uigh[u]rs could train to fight the Chinese oppression." *See* CSRT Exhibit R4, at 2 (App. 40) (FBI interview report dated December 9, 2002). Parhat's own statement was that the camp was given to the Uighurs by the "Afghani Government." CSRT Exhibit R6, at 1-2 (App. 49-50) (FBI interview report dated July 19, 2003).[6] Of course, the Taliban was the "Afghani Government" in 2001, and not all entities provided with housing by that government -- which no doubt ranged from orphanages to terrorist organizations like al Qaida -- were "associated" with the Taliban in a sense that would make them enemy combatants.

In any event, the government's reliance on Basit's interview report is problematic because the CSRT was not provided with exculpatory evidence on the same point. Although the report states that Basit said he had been told that the camp was provided to the Uighurs by the Taliban,[7] Parhat's appellate

---

[6]Parhat also testified that he did not "believe Osama bin Laden or the Taliban were financially providing for the camp," CSRT Decision, encl. 3, at 2 (App. 20), that he saw "only Uighur people" at the camp, *id.* at 6 (App. 24), and that "[t]he people in Turkistan will not associate with al Qaida," *id.* at 7 (App. 25).

[7]We note that Basit testified at his own CSRT that he had "no idea" who provided the camp. That testimony is available on DOD's

counsel has called our attention to evidence from another Uighur's CSRT to the effect that the Uighur camp was actually in existence prior to the Taliban takeover of Afghanistan. *See* Pet'r Br. 4; Affidavit of Susan Baker Manning (App. 192-93) (quoting a Tribunal member's statement in the November 30, 2004 CSRT of detainee Abdul Semet, that [classified material redacted]). This evidence was not presented to Parhat's CSRT.

As noted in Part II, the Navy Memorandum requires the CSRT Recorder to present to the Tribunal any "evidence to suggest that the detainee should not be designated as an enemy combatant." Navy Memorandum at E-1 § H(4). This obligation certainly includes testimony given by other detainees in the course of other CSRT proceedings prior to the commencement of the detainee's own. *See id.* at E-2 §§ B(1), C(1); *Boumediene*, slip op. at 60-61 (noting that, under the DTA, the detainee has "no opportunity to present evidence discovered *after* the CSRT proceedings concluded" (emphasis added)). If, in order to support the proposition that ETIM is associated with the Taliban (a necessary element of the government's definition of "enemy combatant"), the government is going to rely on the statement in Basit's interview report that the camp he stayed in was provided by the Taliban, then it must also give the Tribunal

---

website, *see* www.dod.mil/pubs/foi/detainees/csrt/Set_16_1363-1446.pdf (last accessed June 9, 2008), but it was not presented to Parhat's CSRT. Because the website does not disclose whether Basit's testimony pre- or post-dated Parhat's CSRT, it is unclear whether we may consider it on this review. *See Boumediene*, slip op. at 60-61 (holding that "the DTA review proceeding falls short of being a constitutionally adequate substitute" for habeas because the detainee has "no opportunity to present evidence discovered after the CSRT proceedings concluded").

an opportunity to consider contrary evidence.[8]   Because the Tribunal was not afforded that opportunity, we cannot conclude that reliance on the interview report "was consistent with the standards and procedures specified by the Secretary of Defense." DTA § 1005(e)(2)(C)(i).[9]  We express no opinion as to whether the Recorder's failure to present exculpatory evidence to the CSRT serves as an independent ground for invalidating the Tribunal's entire determination.

C

Proving the third element of DOD's definition of enemy combatant requires evidence that ETIM engaged in hostilities against the United States or its coalition partners.  As with the

---

[8]We also note that the government ultimately determined that Basit was not an enemy combatant and released him from Guantanamo, notwithstanding that -- like Parhat -- he acknowledged that he took weapons training at the camp.  *See* Notice by United States of Transfer of Petitioners, *Mamet v. Bush*, No. 05-1886 (D.D.C. May 5, 2006) (advising the district court that the government had released from Guantanamo and transferred to Albania for release certain Uighur detainees, including Basit, who were "no longer classified as enemy combatants").

[9]The government contends that examination of statements from other detainees' CSRTs is contrary to the holding in *Bismullah* that the DTA "does not authorize this court to determine whether a status determination is arbitrary and capricious because . . . it is inconsistent with the status determination of another detainee who was detained under similar circumstances."  501 F.3d at 186.  We have not, however, examined those statements to determine whether the different CSRTs acted inconsistently, but rather to determine whether the government honored its obligation to present Parhat's CSRT with exculpatory evidence -- as required by the "procedures specified by the Secretary of Defense."  DTA § 1005(e)(2)(C)(i).

second element, the principal evidence supporting this element comes from the four government intelligence documents described above. Because the documents are classified, much of the following discussion is redacted from the public version of this opinion. As we have previously noted, there is no allegation or evidence that Parhat personally engaged in any such hostilities. *See* CSRT Decision, encl. 2, at 2-3 (App. 15-16); [classified material redacted].

[Classified material redacted.]

In its brief, the government seeks further support in two unclassified lists that designate ETIM as a terrorist organization, one established by the Department of State and the other by a United Nations Security Council committee. Neither list discloses the grounds upon which the designation was made.[10] In any event, because neither list was submitted to Parhat's CSRT, neither can be relied upon to support its determination here.

IV

As Part III indicates, the principal evidence against Parhat regarding the second and third elements of DOD's definition of enemy combatant consists of four government intelligence documents. The documents make assertions -- often *in haec verba* -- about activities undertaken by ETIM, and about that organization's relationship to al Qaida and the Taliban. The documents repeatedly describe those activities and relationships as having "reportedly" occurred, as being "said to" or "reported to" have happened, and as things that "may" be true or are "suspected of" having taken place. But in virtually every

---

[10][Classified material redacted.]

instance, the documents do not say who "reported" or "said" or "suspected" those things.[11]  Nor do they provide any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting.  Because of those omissions, the Tribunal could not and this court cannot assess the reliability of the assertions in the documents.  And because of this deficiency, those bare assertions cannot sustain the determination that Parhat is an enemy combatant.[12]

The CSRT's obligation to assess the reliability of evidence is expressly stated in the Navy Memorandum's provision on "Admissibility of Evidence."  This provision states that the Tribunal may consider hearsay evidence -- which the intelligence reports plainly are -- but in so doing it must "tak[e] into account the reliability of such evidence in the circumstances."  Navy Memorandum at E-1 § G(7).  That obligation, and the concomitant requirement that reliability be assessable, are also inherent in the Memorandum's direction --

_____

[11]The only exception is the reference in three of the documents, which is repeated in almost identical language in each, to a statement by an unnamed Uighur detainee at Guantanamo:  [Classified material redacted.]  The government did not provide the CSRT (or the court) with the interview report of that detainee, notwithstanding that it did provide the report of another detainee upon which it relied for a different point.  *See* CSRT Exhibit R4 (App. 46) (FBI interview report of Akhdar Qasem Basit).  Thus, the CSRT had no opportunity to assess how the unnamed detainee obtained this information, or to see how the government interviewer assessed the detainee's reliability, [classified material redacted], or otherwise to do so on its own.

[12]As we noted in Part III, several statements in the intelligence documents also appear to be inconsistent with the government's theory that ETIM and al Qaida or the Taliban are the same "organization" for purposes of the AUMF.

adopted by Congress in the DTA -- that the CSRT must decide whether "a preponderance of the evidence" supports the determination that the detainee is an enemy combatant. *Id.* at E-1 § G(11); *see* DTA § 1005(e)(2)(C)(i). As the Supreme Court explained in *Concrete Pipe*, in the course of discussing the nature of "the burden of showing something by a 'preponderance of the evidence'": "Before any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 622 (1993).[13] Both the obligation and the requirement likewise flow from the Memorandum's establishment of a "*rebuttable* presumption that the Government Evidence is 'genuine and accurate.'" Navy Memorandum at E-1 § G(11) (emphasis added). If a Tribunal cannot assess the reliability of the government's evidence, then the "rebuttable" presumption becomes effectively irrebuttable. *Cf. Bismullah*, 501 F.3d at 186 (noting that a rebuttable presumption of regularity "would be irrebuttable, in effect, if neither petitioners' counsel nor the court could ever look behind the presumption to the actual facts").

This court, in turn, has two responsibilities with respect to the reliability of the evidence presented to the CSRT. First, in order to judge "whether the [CSRT's determination] was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals,"

---

[13]*See Singletary v. Reilly*, 452 F.3d 868, 873 (D.C. Cir. 2006) (holding that hearsay presented at a parole board hearing "was not demonstrated to be reliable and that the Board's decision to revoke [the appellant's] parole was therefore totally lacking in evidentiary support" (internal quotation marks and citation omitted)).

DTA § 1005(e)(2)(C)(i), we must assure ourselves that the CSRT had the opportunity to -- and did -- evaluate the reliability of the evidence it considered. Second, in order to ensure, as the DTA requires, that "the conclusion of the Tribunal [is] supported by a preponderance of the evidence," allowing only a "rebuttable" presumption in favor of the Government's evidence, *id.*, we must be able to assess the reliability of that evidence ourselves.

Insistence that the Tribunal and court have an opportunity to assess the reliability of the record evidence is not simply a theoretical exercise. Parhat contends that the ultimate source of key assertions in the four intelligence documents is the government of the People's Republic of China, and he offers substantial support for that contention.[14] Parhat further maintains that Chinese reporting on the subject of the Uighurs cannot be regarded as objective, and offers substantial support for that proposition as well.[15]

The CSRT's own written decision makes clear both its inability to assess the reliability of most of the evidence presented to it and the importance of its being able to do so. Although the cover sheet of the Tribunal's decision reaches the bottom-line conclusion that Parhat "is properly designated as an enemy combatant" because he "is affiliated with forces associated with al Qaida and the Taliban (i.e., the 'East Turkistan Islamic Movement,') which are engaged in hostilities against the United States or its coalition partners," CSRT Decision, Cover Sheet (App. 10), the underlying decision is considerably more qualified. It states: "The Tribunal found the Detainee to be an enemy combatant because of his *apparent*

---

[14][Classified material redacted.]

[15][Classified material redacted.]

ETIM affiliation . . . [classified material redacted], but despite the fact that the ETIM *is said to be* making plans for future terrorist activities against U.S. interests, no source document evidence was introduced to indicate how this group has actually done so . . . ." *Id.* encl. 2, at 3 (App. 16) (emphases added). It further states that the "Detainee is considered to be an enemy combatant because he is *said to be* affiliated with the ETIM," and that "[t]he camp at which he trained was an ETIM camp *apparently* funded in part by Usama bin Laden and the Taliban." *Id.* at 1 (App. 14) (emphases added); *see also id.* at 2 (App. 15) (referring again to Parhat's "*alleged* ETIM affiliation" (emphasis added)).

Moreover, in the two instances in which the CSRT did have exogenous information with which to assess the reliability of statements made in the intelligence documents, it found sufficient discrepancies to question one statement and to "doubt the veracity" of the other. *Id*. at 2-3 (App. 15-16).[16] The Tribunal plainly fulfilled its obligation to evaluate the reliability of those two statements. In doing so, it performed the kind of assessment that a CSRT must make in order to determine whether a detainee has been properly classified as an enemy combatant. And yet, that is precisely the kind of assessment that the Tribunal could not make with respect to the bulk of the evidence before it.

The government does not dispute that DOD's standards and procedures require that the CSRT be able to assess the reliability of the record evidence. *See* Unclassified Oral Arg. Tr. 39. It argues, however, that the Tribunal was able to do so here -- for two reasons.

---

[16]The two instances, which we discuss in this footnote, involve classified information. [Classified material redacted.]

First, the government suggests that several of the assertions in the intelligence documents are reliable because they are made in at least three different documents. We are not persuaded. Lewis Carroll notwithstanding, the fact that the government has "said it thrice" does not make an allegation true. *See* LEWIS CARROLL, THE HUNTING OF THE SNARK 3 (1876) ("I have said it thrice: What I tell you three times is true."). In fact, we have no basis for concluding that there are independent sources for the documents' thrice-made assertions. To the contrary, as noted in Part III, many of those assertions are made in identical language, suggesting that later documents may merely be citing earlier ones, and hence that all may ultimately derive from a single source. And as we have also noted, Parhat has made a credible argument that -- at least for some of the assertions -- the common source is the Chinese government, which may be less than objective with respect to the Uighurs. Other assertions in the documents may ultimately rely on interview reports (not provided to the Tribunal) of Uighur detainees, who may have had no first-hand knowledge and whose speculations may have been transformed into certainties in the course of being repeated by report writers.

Second, the government insists that the statements made in the documents are reliable because the State and Defense Departments would not have put them in intelligence documents were that not the case. This comes perilously close to suggesting that whatever the government says must be treated as true, thus rendering superfluous both the role of the Tribunal and the role that Congress assigned to this court. We do not in fact know that the departments regard the statements in those documents as reliable; the repeated insertion of qualifiers indicating that events are "reported" or "said" or "suspected" to have occurred suggests at least some skepticism. Nor do we know whether the departments rely on those documents for decisionmaking purposes in the form in which they were

presented to the Tribunal, or whether they supplement them with backup documentation and reliability assessments before using them to take actions of consequence.

To be clear, we do *not* suggest that hearsay evidence is never reliable -- only that it must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability.  Nor do we suggest that the government must always submit the underlying basis for its factual assertions in order to make such an assessment possible. In many cases, such submissions will be advisable and reasonably available:  the detainees' counsel are cleared for classified information, and, where its source is highly sensitive, *Bismullah* held that it can be shown to the court (and CSRT) alone.  *See* 501 F.3d at 180 ("[T]he Government may withhold from counsel, but not from the court, certain highly sensitive information.").  But there may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source.  Courts have frequently relied on such methods in the Fourth Amendment context,[17] and have permitted the use of appropriate nonclassified substitutions under the Classified Information

---

[17]*Cf. Rugendorf v. United States*, 376 U.S. 528, 533 (1964) (holding that a search warrant affidavit that withholds the name of an informant is not deficient "so long as there [is] a substantial basis for crediting the hearsay" based on other information (internal quotation marks and citation omitted)); *United States v. Laws*, 808 F.2d 92, 95 (D.C. Cir. 1986) (affirming the sufficiency of a warrant based on a confidential informant's tip where there was "substantial reason to believe that . . . the hearsay is reliable").

Procedures Act (CIPA).[18]    Indeed, the Navy Memorandum expressly directs agencies with "reasonably available information . . . bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant" either to provide the information to the Tribunal or to provide "an acceptable substitute," which "may include an unclassified or, if not possible, a lesser classified, summary of the information."  Navy Memorandum at E-1 § E(3).

In this opinion, we neither prescribe nor proscribe possible ways in which the government may demonstrate the reliability of its evidence.  We merely reject the government's contention that it can prevail by submitting documents that read as if they were indictments or civil complaints, and that simply assert as facts the elements required to prove that a detainee falls within the definition of enemy combatant.  To do otherwise would require the courts to rubber-stamp the government's charges, in contravention of our understanding that Congress intended the court "to engage in *meaningful* review of the record." *Bismullah*, 503 F.3d at 180 (emphasis added); *see Boumediene*, slip op. at 49 (stating that the "DTA should be interpreted to accord some latitude to the Court of Appeals to fashion procedures necessary to make its review function a meaningful one").

V

Having concluded that the evidence before the CSRT was insufficient to sustain its determination that Parhat is an enemy combatant, we are left with the question of remedy.  Parhat avers that, while remand for a new CSRT may be appropriate in the

---

[18]*See* CIPA, 18 U.S.C. App. III, § 4; *United States v. Rezaq*, 134 F.3d 1121, 1142-43 (D.C. Cir. 1998).

"usual" case in which the flaws a court identifies in the record evidence are capable of correction, *see* Unclassified Oral Arg. Tr. 12, his case is different because the CSRT's errors "cannot be cured," Pet'r Br. 24. Remand here would serve no purpose, he maintains, because the record on review is "the best record the Government's ever going to have in this case," and the government has no more reliable evidence to produce. Unclassified Oral Arg. Tr. 12. He thus urges the court to order that he be released or transferred to a country "other than China or any of its satellites." Pet'r Br. 27 n.31; *see* Unclassified Oral Arg. Tr. 18.

Although we are cognizant of the time that Parhat has already spent in detention, the procedural posture of this case counsels against our directing immediate release or transfer and in favor of giving the government the option of holding another CSRT. At Parhat's behest, we have limited our review to the evidence presented to his CSRT, without awaiting the production of all of the "Government Information" as required by *Bismullah*. We therefore cannot know whether the government has additional evidence that would cure the reliability issues we have identified.

This is not to suggest, however, that we will countenance the "endless 'do-overs'" that Parhat fears. Pet'r Br. 27. Even the government concedes that the case for release will be "substantially stronger" if it falls short after a second CSRT. Unclassified Oral Arg. Tr. 46. And while the DTA does not expressly grant the court release authority, there is a strong argument (which the Supreme Court left unresolved in *Boumediene*, *see* slip op. at 59, 63, and which we need not resolve today) that it is implicit in our authority to determine whether the government has sustained its burden of proving that a detainee is an enemy combatant. Were that not the case, the DTA would consign the court to issuing an endless series of

effectively advisory opinions on the quality of the government's evidence, a task we doubt Congress had in mind for the Judicial Branch.

We also note that DTA review is not Parhat's only, or his best, path to release. *Boumediene* made it quite clear that, at least for a detainee like Parhat who has been imprisoned for a lengthy period and has already had a CSRT, a habeas corpus proceeding in the district court is also available. *See Boumediene*, slip op. at 65-66. He may pursue such a proceeding immediately, without waiting to learn whether the government will convene another CSRT. *See id.* at 66 ("The detainees in these cases are entitled to a prompt habeas corpus hearing."); *id.* (holding that "both the DTA and the CSRT process remain intact" and that "the petitioners in these cases need not exhaust the [DTA] review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court"). The habeas proceeding will have procedures that are more protective of Parhat's rights than those available under the DTA. *See id.* at 49 (holding that the DTA's review procedures are not "as extensive or as protective of the rights of the detainees as they would be in a § 2241 proceeding"). In that proceeding, he will be able to make use of the determinations we have made today regarding the decision of his CSRT, and he will be able to raise issues that we did not reach. Most important, in that proceeding there is no question but that the court will have the power to order him released. *Id.* at 58 (holding that the habeas court has "authority to . . . issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release"); *see also id.* at 50.

Accordingly, we direct the government to release Parhat, to transfer him,[19] or to expeditiously convene a new CSRT to consider evidence submitted in a manner consistent with this opinion. If the government chooses the latter course, it must -- to obviate the need for another remand -- present to that Tribunal the best record of Parhat's status as an enemy combatant that it is prepared to make.

## VI

Finally, we address the government's motion to designate as "protected information," and thus to bar from public disclosure, two categories of unclassified information in the record on review.

In *Bismullah*, the government "propose[d] unilaterally to determine whether [unclassified] information is 'protected,' meaning that petitioners' counsel must keep it confidential and file under seal any document containing such information." 501 F.3d at 188. "For example, the government would designate as 'protected' information 'reasonably expected to increase the threat of injury or harm to any person' and information already designated by the Government to be 'For Official Use Only' or 'Law Enforcement Sensitive.'" *Id.* The court rejected this proposal, holding that, "insofar as a party seeks to file with the court nonclassified information the Government believes should be 'protected,' the Government must give the court a basis for withholding it from public view." *Id.*

---

[19]The government is under district court order to give 30 days' notice of intent to remove Parhat from Guantanamo. *See Kiyemba v. Bush*, No. 05-1509, Mem. Order at 2-3 (D.D.C. Sept. 13, 2005).

In order to establish procedures for the handling of protected information, the *Bismullah* court adopted a protective order applicable to a group of eight DTA cases that included Parhat's. The order states: "The Government may apply to the court to deem any information 'protected,' and if filed in this court to be maintained under seal. Such information must be maintained under seal unless and until the court determines the information should not be designated as 'protected.'" *Bismullah*, No. 06-1197, Protective Order § 7.A (as amended Oct. 23, 2007). The order defines "protected information" as: "any . . . information deemed by the court, either upon application by the Government or sua sponte, to require special precautions in storage, handling, and control, in order to protect the security of United States Government personnel or facilities, or other significant government interests." *Id.* § 3.F. Information deemed protected under the order can be viewed by opposing counsel but not by the public. *Id.* § 7.B. Classified material is treated under separate provisions of the order. *See, e.g.*, *id.* § 5.

After the court issued the decision in *Bismullah*, the government filed the motion that is presently before us. It seeks to designate as "protected" the following two categories of unclassified information: (1) "any names and/or identifying information of United States Government personnel," and (2) "any sensitive law enforcement information." Resp't Mot. to Designate at 2 (Oct. 1, 2007). The government's rationale for protection is brief. In support of protecting the former category, the motion states: "It is appropriate to protect from public disclosure unclassified information identifying Government personnel because . . . [t]he risks to the safety of those personnel [, particularly those who often deploy to locations abroad,] would be heightened if their involvement in the detention of enemy combatants at Guantanamo were made public." *Id.* In support of protecting the latter category, the motion states: "It

is . . . appropriate to protect Law Enforcement Sensitive material" because public disclosure "could harm the Government's ongoing law enforcement activities related to the global war against al Qaeda and its supporters." *Id.* at 3.

The government filed the instant motion in identical form in over one hundred other pending DTA cases. At the time it filed the motion, the government had not yet provided Parhat's counsel -- or counsel for any of the other petitioners -- with the record on review.[20] *A fortiori*, it had not yet submitted the designations of the information it regarded as falling into the protected categories. Granting the motion under those circumstances, without knowing which material the government would ultimately designate, would be indistinguishable from permitting the government "unilaterally to determine whether information is 'protected.'" *Bismullah*, 501 F.3d at 188. *Bismullah* plainly bars that result.

The designation problem has not yet been completely resolved, even in Parhat's case. Although the government has now provided the court and Parhat's counsel with his CSRT record, its method of designating material as protected is less than clear. Some pages have been marked with the inscription "LES" for "Law Enforcement Sensitive," without indicating whether the designation is intended to apply to all material on the page. Some pages contain blacked-out lines that appear to be intended as redactions, although the underlying words are still legible. (We understand from oral argument that some of what appear as black-outs were intended as highlights.) And some lines are completely blacked out, making review by the

---

[20]The government has not yet provided the full record on review as defined in *Bismullah* in any DTA case, and it has not provided the full CSRT record in many cases.

court impossible and acceptance of the government's unilateral determination the only ground upon which the material could be protected.

But correction of the government's marking protocol will not cure the underlying flaw in the government's motion. As set forth above, the motion relies solely on spare, generic assertions of the need to protect information in the two categories it identifies. The government does not "give the court a basis for withholding" that is specific to the information it has designated in this case. *Bismullah*, 501 F.3d at 188. Nor does it offer any basis upon which we may determine whether the information it has designated properly falls within the categories it has described.

We do not doubt that there is sensitive law enforcement information that warrants protection from disclosure. Nor does counsel for Parhat. *See* Pet'r Reply Br. 19. But "Law Enforcement Sensitive" is an imprecise term; at least seven different federal agencies define it differently. *See* U.S. GOVERNMENT ACCOUNTABILITY OFFICE, GAO 06-385, *Information Sharing: The Federal Government Needs to Establish Policies and Processes for Sharing Terrorism-Related and Sensitive but Unclassified Information* 24 (2006); *cf.* Pres. George W. Bush, Memorandum for the Heads of Executive Departments and Agencies: Designation and Sharing of Controlled Unclassified Information (CUI) (May 9, 2008) (establishing a new framework for "controlled unclassified information"). Similarly, we do not doubt that the names and identifying information of some United States Government personnel should be designated as "protected." Again, neither does Parhat's counsel, who readily concedes that the designation is appropriate for those military personnel who participated in CSRT hearings and may be for others as well. Pet'r Reply Br. 19. But there are also some "U.S. Government personnel"

whose names appear in the record on review who are so publicly associated with Guantanamo that protected status would plainly be unwarranted.

By resting its motion on generic claims applicable to all of the more than one hundred cases in which the motion was filed, the government has effectively duplicated its request "unilaterally to determine whether information is 'protected.'" *Bismullah*, 501 F.3d at 188. Without an explanation tailored to the specific information at issue, we are left with no way to determine whether it warrants protection -- other than to accept the government's own designation. This we cannot do because, as we held in *Bismullah*, "[i]t is the court, not the Government, that has discretion to seal a judicial record, which the public ordinarily has the right to inspect and copy." *Id.* (internal citations omitted); *see also Bismullah* Protective Order § 3.F (defining "protected information" as "information *deemed by the court* . . . to require special precautions . . . in order to protect the security of United States Government personnel or facilities, or other significant government interests" (emphasis added)).

Because we are unable to determine, on the pleadings before us, whether the information that the government has designated should be deemed "protected," we deny the government's motion without prejudice. "Such information must," however, "be maintained under seal unless and until the court determines the information should *not* be designated as 'protected.'" *Id.* § 7.A (emphasis added). The government is directed to file, within 30 days, a renewed motion, accompanied by a marked copy of Parhat's CSRT record indicating the information for which it seeks protected status. That filing must also be accompanied by pleadings specifically explaining why protected status is required for the information that has been marked. Opposing counsel may file a response, and the government may file a reply, pursuant to our usual rules.

## VII

Congress has directed this court "to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." DTA § 1005(e)(2)(A). In so doing, we are to "determine," inter alia, whether the CSRT's decision "was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals[,] including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence." *Id.* § 1005(e)(2)(C)(i). A CSRT's decision regarding enemy combatant status was not consistent with those standards and procedures unless the Tribunal had -- and took -- the opportunity to assess the reliability of the evidence that the government presented to it. Nor can this court conclude that such a decision was consistent with those standards and procedures unless we, too, are able to assess the reliability of the government's evidence. Because the evidence that the government submitted to Parhat's CSRT did not permit the Tribunal to make the necessary assessment, and because the record on review does not permit the court to do so, we cannot find that the government's designation of Parhat as an enemy combatant was consistent with the specified standards and procedures and is supported by a preponderance of the evidence.

We therefore direct the government to release or to transfer[21] the petitioner, or to expeditiously hold a new CSRT consistent with this opinion. This disposition is without prejudice to Parhat's right to seek release immediately through a writ of habeas corpus in the district court, pursuant to the Supreme Court's decision in *Boumediene*, slip op. at 65-66. We

---

[21]*See supra* note 19.

also deny, without prejudice, the government's motion to designate certain unclassified material in the CSRT record as "protected information," subject to the filing of a renewed motion accompanied by pleadings sufficient to explain why such designations are warranted in this case.

*So ordered.*